## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ANDRE MAULDIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. |
| | ) |
| SALEH OBAISI; IMHOTEP CARTER; | ) |
| PARTHASARATHI GHOSH; WEXFORD | ) |
| HEALTH SOURCES, INC.; TARRY WILLIAMS; | ) |
| MICHAEL MAGANA; MICHAEL LEMKE; | ) |
| MARCUS HARDY; UNKNOWN STATEVILLE | ) |
| CORRECTIONAL CENTER HEALTHCARE | ) |
| UNIT ADMINISTRATOR; DONALD | ) |
| STOLWORTHY; UNKNOWN ILLINOIS | ) |
| DEPARTMENT OF CORRECTIONS | ) |
| EMPLOYEES; AND UNKNOWN WEXFORD | ) |
| HEALTH SOURCES, INC. EMPLOYEES, | ) |
| | ) |
| Defendants. | ) |
| | )    JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Andre Mauldin, by and through his attorneys, Loevy & Loevy, complains of

Defendants Saleh Obaisi, Imhotep Carter, Parthasarathi Ghosh, Wexford Health Sources, Inc.,

Tarry Williams, Michael Magana, Michael Lemke, Marcus Hardy, Unknown Stateville

Correctional Center Healthcare Unit Administrator, Donald Stolworthy, Unknown Illinois

Department of Corrections Employees, and Unknown Wexford Health Sources, Inc. Employees,

and states as follows:

### Introduction

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of law of Mr. Mauldin's rights as secured by the United States Constitution.

2.     Mr. Mauldin has been complaining to Defendants about the severe pain that he has been suffering in his right knee for years.  For many years, Defendants ignored Mr. Mauldin's complaints altogether, failing to provide constitutionally adequate medical care or access to constitutionally adequate medical care.

3.     In May 2012, Mr. Mauldin was at last taken to have an MRI of his right knee. That MRI showed major structural damage to his knee, including a torn ACL and other major ligament tears or sprains.  Three orthopedic surgeons reviewing Mr. Mauldin's MRI results all agreed that Mr. Mauldin needed immediate follow-up care and surgery.

4.     Yet Defendants have continued to deny Mr. Mauldin the treatment that specialists already determined he needs.  To this day, Mr. Mauldin has yet to receive any treatment for his seriously damaged knee.  As a result, he continues to suffer agonizing pain and impairment with daily activities like walking and climbing stairs.

## Jurisdiction and Venue

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

6.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

7.     Plaintiff Andre Mauldin is in the custody of the Illinois Department of Corrections (IDOC).  At all times relevant to the events at issue in this case, Mr. Mauldin was housed at Stateville Correctional Center (Stateville).

8.     Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquarted in Pennsylvania transacting business in Illinois.  Wexford, pursuant to a contract with the State

of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices at Stateville and the IDOC generally. As an agent of the IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Stateville.

9. At all times relevant to his involvement in this case, Defendant Parthasarathi Ghosh was a physician at Stateville, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Ghosh is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Ghosh was acting under color of law and within the scope of his employment.

10. At all times relevant to his involvement in this case, Defendant Imhotep Carter was a physician at Stateville, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Carter is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Carter was acting under color of law and within the scope of his employment.

11. At all times relevant to his involvement in this case, Defendant Saleh Obaisi was a physician at Stateville, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Obaisi is sued here in his individual capacity. At all times relevant to the events at

issue in this case, Defendant Obaisi was acting under color of law and within the scope of his employment.

12.     At all times relevant to his involvement in this case, Defendant Unknown Healthcare Unit Administrator was the Healthcare Unit Administrator at Stateville, an employee of either the IDOC or Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville.  At all times relevant to the events at issue in this case, Defendant Unknown Healthcare Unit Administrator was acting under color of law and within the scope of his or her employment.

13.     At all times relevant to his involvement in this case, Defendant Tarry Williams was the Warden at Stateville, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Williams is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Williams was acting under color of law and within the scope of his employment with the IDOC.

14.     At all times relevant to his involvement in this case, Defendant Michael Magana was the Warden at Stateville, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Magana is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Magana was acting under color of law and within the scope of his employment with the IDOC.

15.     At all times relevant to his involvement in this case, Defendant Michael Lemke was the Warden at Stateville, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant

4

Lemke is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Lemke was acting under color of law and within the scope of his employment with the IDOC.

16.     At all times relevant to his involvement in this case, Defendant Marcus Hardy was the Warden at Stateville, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Hardy is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Hardy was acting under color of law and within the scope of his employment with the IDOC.

17.     Donald Stolworthy is the current Director of the IDOC.  He is sued in his official capacity as the Director of the IDOC.  Plaintiff asserts only claims for injunctive relief against Defendant Stolworthy.  As the Director of the IDOC, Defendant Stolworthy acts under color of law.

## Allegations

18.     Mr. Mauldin has been suffering severe pain in his right knee since approximately 1992.  For years, he requested medical attention for his knee from IDOC and Wexford staff.  For years, Defendants and other IDOC and/or Wexford staff did nothing to evaluate or diagnose Mr. Mauldin's knee problems, treat his severe pain and knee problems, or ensure that he received access to proper medical care.

19.     In 2010, Mr. Mauldin requested medical attention from medical staff at Stateville by submitting numerous requests for medical attention.  Mr. Mauldin's requests were ignored and he received no medical evaluation or care.

20.     In June 2010, Mr. Mauldin wrote to Defendant Ghosh, who was the Medical Director at Stateville at the time.  He told Defendant Ghosh about the severe pain he was

suffering and reported that he had submitted numerous sick call slips without any response. Defendant Ghosh ignored the letter and Mr. Mauldin received no medical evaluation or care.

21.     Mr. Mauldin was finally seen by a doctor in his housing unit at Stateville on December 23, 2010.  Mr. Mauldin complained to the doctor about the severe pain he was suffering in his right knee.  The doctor referred Mr. Mauldin to Defendant Ghosh to evaluate the knee.

22.     On January 10, 2011, Mr. Mauldin saw Defendant Ghosh and complained to him that his right knee was causing him severe pain, and that it was unstable and would give out when he put weight on it.  Defendant Ghosh performed only a cursory examination of Mr. Mauldin's knee, and determined that Mr. Mauldin had a chronic right knee injury.  Defendant Ghosh did not provide any treatment or medications for Mr. Mauldin's knee pain.

23.     Mr. Mauldin saw Defendant Ghosh again in February 2011.  He reported that he continued to suffer pain.  Defendant Ghosh again performed only a cursory examination of Mr. Mauldin's knee.  He did not diagnose the source of Mr. Mauldin's knee pain and did not arrange for Mr. Mauldin to receive any further medical evaluation or treatment.  Instead, he prescribed Aleve and told Mr. Mauldin that he would put him on the waiting list for physical therapy.

24.     Mr. Mauldin did not see a physical therapist until more than a year later.  During that time, Mr. Mauldin continued to suffer extreme pain in his right knee, which repeatedly would give out during daily activities like walking, climbing stairs to his cell, and climbing the ladder to his upper bunk.  Mr. Mauldin's Aleve prescription ended in early March 2011 and was not renewed, leaving Mr. Mauldin without anything to alleviate his pain.  Mr. Mauldin repeatedly complained to the nurses who visited his housing unit to administer medications.  The

nurses told Mr. Mauldin that they would put him on a list to be seen by medical personnel in the healthcare unit, but he was not seen.

25.     On February 14, 2012, Mr. Mauldin finally saw a physical therapist.  The physical therapist conducted a physical evaluation of Mr. Mauldin's knee.  He immediately noticed the extensive laxity in Mr. Mauldin's right knee, which he told Mr. Mauldin he suspected was due to a complete ligament tear.  The physical therapist told Mr. Mauldin that he was not a candidate for physical therapy because of the loss of the structural integrity of the knee.

26.     The physical therapist immediately referred Mr. Mauldin to Defendant Carter, who by then had replaced Defendant Ghosh as the Medical Director at Stateville.  The physical therapist noted that he believed an MRI of the knee was appropriate because of the extensive laxity and loss of structural integrity.

27.     One week later, the physical therapist followed up with Defendant Carter and personally handed him the referral report he had completed a week earlier.  Defendant Carter approved the recommendation for an MRI.  Defendant Carter never examined Mr. Mauldin's knee to determine the extent of the injury or make his own diagnosis.

28.     Defendants forced Mr. Mauldin to wait an additional 3 months before he was taken to the University of Illinois Hospital to have the MRI performed on his right knee.  During that time, Mr. Mauldin continued to suffer extreme pain from a right knee that could not support his weight.

29.     On May 24, 2012, Mr. Mauldin was finally taken to the University of Illinois Hospital for an MRI of his right knee.  The MRI showed that Mr. Mauldin (a) had completely torn his anterior cruciate ligament (ACL), (b) had sprained his proximal lateral collateral ligament (LCL), (c) had a small tear of the lateral meniscus, (d) had mild to moderate arthritis in

his medial and lateral compartments of his knee, and (e) had a suspected fragment loose in his knee. In other words, Mr. Mauldin's knee had serious structural damage.

30.     Mr. Mauldin returned to the University of Illinois Hospital on May 30, 2012 for a consultation with 3 orthopedic surgeons. Unsurprisingly, they told Mr. Mauldin that he needed immediate reconstructive surgery to repair the ACL and other structural damage in his right knee. Unfortunately, they also told Mr. Mauldin that they could not schedule him for surgery unless and until IDOC and Wexford staff approved their recommendation for surgery. Mr. Mauldin was taken back to Stateville later that day.

31.     Upon his return from the hospital, Mr. Mauldin was seen by a nurse who took his vitals. The nurse told him that he would be scheduled for a follow-up appointment with the Medical Director at Stateville 10 days later. Approximately 10 days later, Mr. Mauldin was taken to the healthcare unit at Stateville where he waited for several hours to see the doctor. Before seeing Mr. Mauldin, however, the doctor left for the day. Mr. Mauldin was taken back to his cell and was told that his appointment would be rescheduled. It never was.

32.     The orthopedic surgeons at the University of Illinois Hospital wrote their recommendations, including the need for an immediate follow-up with an orthopedic surgeon for further evaluation prior to the surgery, and sent it to the healthcare unit at Stateville. It was received by the medical staff there.

33.     Despite the surgeons' clear recommendation for immediate follow-up and reconstructive surgery, Mr. Mauldin received no medical attention for a year. Specifically, following his return from the hospital on May 30, 2012, Mr. Mauldin received no medical evaluation or treatment from any medical or nonmedical personnel until May 28, 2013. During that time, Mr. Mauldin submitted more than 13 sick call slips and wrote 5 letters to Defendant

Carter and the Medical Director at Stateville. Each time, Mr. Mauldin complained about the excruciating pain that he was suffering in his right knee, reported that he had not been seen since his return from the hospital, and asked to be seen by medical staff immediately. Each letter and each sick call slip was ignored and went unanswered.

34.     Mr. Mauldin also made oral requests for medical care to nurses administering medication to his cellmate and other prisoners in his housing unit. Each time, the nurses told him to submit another sick call request and refused to provide him medical treatment or access to medical treatment.

35.     On May 28, 2013, Mr. Mauldin saw Defendant Obaisi in the healthcare unit at Stateville. Mr. Mauldin told Defendant Obaisi about his MRI a year earlier. Defendant Obaisi asked Mr. Mauldin sarcastically why he hadn't seen anyone in a year. Mr. Mauldin told him about the numerous sick call slips he had submitted, his letters to the doctors, and his frequent oral requests to nurses administering medications in his housing unit.

36.     Defendant Obaisi read the results of Mr. Mauldin's MRI and "determined" that Mr. Mauldin had a torn ligament in his right knee. He told Mr. Mauldin that he would recommend to Wexford that Mr. Mauldin be returned to the hospital for follow-up treatment. In reality, however, Defendant Obaisi did nothing. He did not arrange for Mr. Mauldin to return to the University of Illinois Hospital. He did not prescribe any medication for Mr. Mauldin's extreme pain. He did not even arrange for Mr. Mauldin to return to the healthcare unit at Stateville for further evaluation or testing at a later date.

37.     Another year passed before Mr. Mauldin received any further medical evaluation or treatment. During that year, Mr. Mauldin submitted at least 26 sick call slips and wrote Defendant Obaisi at least 2 letters. Each sick call slip echoed earlier slips, complaining about his

9

severe pain, noting that the surgeons at the University of Illinois Hospital had recommended immediate surgery, and pleading to see medical staff. Again, his requests were ignored and went unanswered.

38. In addition, Mr. Mauldin continued requesting medical care orally to nurses administering medication to his cellmate and other prisoners in his housing unit. The nurses again told him to submit another sick call slip and refused to provide him medical treatment or access to medical treatment.

39. By the time he was finally seen by medical staff at the healthcare unit on May 28, 2014, the pain was so severe that he was occasionally unable to walk. At other times, his knee would give out under his weight as he was walking, causing him to fall. Unable to get a permit for a knee brace, Mr. Mauldin tried to improvise a knee brace by using elastics from his socks to help stabilize his knee. This provided only slight relief. Mr. Mauldin also compensated by shifting all of his weight to his left leg, which in turned caused him to suffer severe pain in his left knee.

40. On May 28, 2014, Mr. Mauldin saw two nurses in the healthcare unit. He reported feeling 10 out of 10 on the pain scale and explained to them his history of being ignored and refused treatment. Upon evaluating his right knee, the nurses were disgusted at the amount of structural damage present. They told Mr. Mauldin that they would put him on the list to be seen by Defendant Obaisi immediately, and gave him Tylenol for his pain.

41. Mr. Mauldin was seen by Defendant Obaisi in the healthcare unit on June 2, 2014. Mr. Mauldin told Defendant Obaisi about the pain that he was suffering, and reported that he still had not received any follow-up care for his knee. Defendant Obaisi told Mr. Mauldin that he had lost Mr. Mauldin's MRI results. Mr. Mauldin told Defendant Obaisi that he had already

10

reviewed the results of the MRI when Defendant Obaisi last saw him in May 2013. Defendant

Obaisi refused to provide him any further evaluation or treatment, however, telling Mr. Mauldin

only that he would try to find the MRI results. He again refused to arrange for Mr. Mauldin to

return to the University of Illinois Hospital. He again refused to prescribe any medication for

Mr. Mauldin's extreme pain. Again, he did not even schedule Mr. Mauldin to be seen by

medical staff at the healthcare unit for further evaluation or testing at a later date.

42.     Mr. Mauldin waited another seven months before receiving any medical care

whatsoever. On February 25, 2015, Mr. Mauldin was taken back to the University of Illinois

Hospital. There he saw an orthopedic surgeon who told him that the MRI of his right knee was

now too outdated and he would need another MRI before he could be scheduled for surgery.

43.     To date, Mr. Mauldin has not received any care for his severely damaged right

knee. This is directly attributable to Defendants' deliberate indifference to Mr. Mauldin's

objectively serious medical needs, and has forced Mr. Mauldin to suffer unnecessary agonizing

pain and impairment with daily activities like walking and climbing stairs.

**COUNT I**
**42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)**
**All Defendants**

44.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

45.     As described more fully above, Defendants had notice of Mr. Mauldin's medical

needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Mauldin if he

did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide

him with any proper medical care or access to medical care, in violation of the Eighth

Amendment to the United States Constitution.

11

46.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Mauldin experienced pain, suffering, emotional distress, and injury.

47.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Mauldin's rights.

48.     Alternatively, Defendants were deliberately indifferent to Mr. Mauldin's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Mauldin's rights.

49.     Mr. Mauldin's injuries were proximately caused by policies and practices of Defendants.

50.     At all times relevant to the events at issue in this case, Defendant Wexford contracted with the IDOC to provide healthcare to men housed at Stateville, including Mr. Mauldin.  As the provider of healthcare services to prisoners incarcerated at Stateville and other IDOC facilities, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

51.     Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Mauldin with serious medical needs were routinely denied medical care and access to medical care.  It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and

practices, Defendant Wexford did nothing to ensure that prisoners at Stateville received adequate medical care and access to medical care, thereby acting with deliberate indifference.

52.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition; (4) healthcare personnel commonly fail to review a prisoner's pertinent medical records before, during, or after an examination or diagnosis of the prisoner; (5) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (6) healthcare personnel fail to provide timely healthcare to prisoners; (7) healthcare personnel fail to respond adequately or timely to diagnostic testing which reveals a serious medical need; (8) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (9) inadequate levels of health care staffing are maintained.

53.     These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services at Stateville, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.  In this way, Defendant Wexford violated Mr.

Mauldin's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

54. The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

55. At all times relevant to their involvement in this case, Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Stateville; the training of IDOC and Wexford staff at Stateville on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of IDOC and Wexford staff at Stateville who provided medical care and were responsible for providing prisoners access to medical care.

56. Prior to the events giving rise to Plaintiff's Complaint, Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Mauldin with serious medical needs were routinely denied medical care and access to medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator did nothing to ensure that prisoners at Stateville received adequate medical care and access to medical care, thereby acting with deliberate indifference.

14

57.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition; (4) healthcare personnel commonly fail to review a prisoner's pertinent medical records before, during, or after an examination or diagnosis of the prisoner; (5) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (6) healthcare personnel fail to provide timely healthcare to prisoners; (7) healthcare personnel fail to respond adequately or timely to diagnostic testing which reveals a serious medical need; (8) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; and (9) inadequate levels of health care staffing are maintained.

58.     These widespread policies and practices were allowed to flourish because Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator who oversaw the provision of healthcare to prisoners at Stateville and were responsible for ensuring that prisoners have access to medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator

15

violated Mr. Mauldin's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

59.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendants Ghosh, Carter, Obaisi, and Unknown Healthcare Unit Administrator were deliberately indifferent to the problem, thereby effectively ratifying it.

60.     At all times relevant to their involvement in this case, Defendants Williams, Magana, Lemke, and Hardy were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding prisoners' access to constitutionally adequate medical care at Stateville; the training of IDOC staff at Stateville on providing prisoners access to medical care; and the supervision of IDOC staff at Stateville.

61.     Prior to the events giving rise to Plaintiff's Complaint, Defendants Williams, Magana, Lemke, and Hardy had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Mauldin with serious medical needs were routinely denied medical care and access to medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendants Williams, Magana, Lemke, and Hardy did nothing to ensure that prisoners at Stateville received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

62.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare and are denied access to

16

constitutionally adequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) inadequate levels of healthcare staffing are maintained; (6) correctional personnel commonly fail or refuse to respond adequately when prisoners request medical attention or ask to see a doctor; and (7) the system by which prisoners request medical evaluation or treatment fails to notify appropriate staff of a prisoner's request or complaint.

63. These widespread policies and practices were allowed to flourish because Defendants Williams, Magana, Lemke, and Hardy, who oversaw healthcare and correctional employees at Stateville and were responsible for ensuring that prisoners had access to constitutionally adequate medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Williams, Magana, Lemke, and Hardy violated Mr. Mauldin's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

64. The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendants

17

Williams, Magana, Lemke, and Hardy were deliberately indifferent to the problem, thereby effectively ratifying it.

65. Mr. Mauldin's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

66. Defendants continue to this day to refuse to provide Mr. Mauldin with constitutionally adequate medical care and refuse to provide Mr. Mauldin access to constitutionally adequate medical care, despite their clear knowledge of Mr. Mauldin's serious medical needs and their appreciation of the risk of continuing harm that their refusals to act pose to Mr. Mauldin. Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

## COUNT II
### 42 U.S.C. § 1983 – Conspiracy
### All Defendants

67. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

68. Defendants reached an agreement among themselves to deprive Mr. Mauldin of his constitutional rights and to protect one another from liability for depriving Mr. Mauldin of his rights, all as described in the various paragraphs of this Complaint.

69. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

70. The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Mauldin's rights.

18

71.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Mauldin's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

72.     Mr. Mauldin's injuries were caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

73.     Defendants continue to this day to conspire to deprive Mr. Mauldin of his constitutional rights and to protect one another from liability for depriving Mr. Mauldin of his rights, all as described in the various paragraphs of this Complaint.  Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**All Defendants**

74.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

75.     As described more fully above, Defendants had a reasonable opportunity to prevent the violation of Mr. Mauldin's constitutional rights as set forth above had they been so inclined, but failed to do so.

76.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Mauldin's rights.

77.     As a direct and proximate result of Defendants' misconduct, Mr. Mauldin's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

78.     Mr. Mauldin's injuries were caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

19

79.     Defendants continue to this day to refuse to provide Mr. Mauldin with constitutionally adequate medical care and to provide Mr. Mauldin access to constitutionally adequate medical care, despite their clear knowledge of Mr. Mauldin's serious medical needs and their appreciation of the risk of continuing harm that their refusals to act pose to Mr. Mauldin.  Other Defendants continue to fail to intervene on Mr. Mauldin's behalf.  Accordingly, he seeks injunctive relief from this Court to stop the continuing constitutional violation.

### COUNT IV
### Intentional Infliction of Emotional Distress
### Defendants Ghosh, Carter, Obaisi, and Wexford

80.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

81.     In the manner described more fully above, by denying Mr. Mauldin medical evaluation or treatment, or access to medical evaluation or treatment, Defendants Ghosh, Carter, Obaisi, and Wexford engaged in extreme and outrageous conduct.

82.     Defendants' actions as set forth above were rooted in an abuse of power or authority.

83.     Defendants' actions as set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

84.     Defendants' actions, as set forth above, were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Mauldin's rights.

85.     The misconduct described in this Count was undertaken by Defendants within the scope of their employment such that their employer, Wexford, is liable for their actions.

86.     As a direct and proximate result of this misconduct, Mr. Mauldin experienced injuries—including severe emotional distress—and suffering.

## COUNT V
### Negligent or Willful and Wanton Conduct
### Defendants Ghosh, Carter, Obaisi, and Wexford

87.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

88.     In the manner described more fully above, the actions of Defendants Ghosh, Carter, Obaisi, and Wexford breached the duty of care owed to prisoners in their care. They did so by negligently ignoring Mr. Mauldin's requests for medical attention.

89.     Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were aware that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

90.     Defendants' actions were undertaken willfully and wantonly, and/or with reckless indifference or conscious disregard for Mr. Mauldin's health and safety.

91.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Mauldin suffered injuries, including pain, suffering, and emotional distress.

## COUNT VI
### Respondeat Superior
### Defendant Wexford

92.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

93.     In committing the acts alleged in the preceding paragraphs, Defendants Ghosh, Carter, and Obaisi were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

94.     Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

95.     Defendant Wexford, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment.  *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793–95 (7th Cir. 2014).

## COUNT VII
### Indemnification

96.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

97.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

98.     One or more Defendants are or were employees of the IDOC and acted within the scope of their employment in committing the misconduct described above.

99.     The State of Illinois is obligated to pay any judgment entered against individual Defendants within the scope of their employment for IDOC.

Wherefore, Plaintiff Andre Mauldin respectfully requests that this Court enter a judgment in his favor and against Defendants Parthasarathi Ghosh, Imhotep Carter, Saleh Obaisi, Wexford Health Sources, Inc., Unknown Stateville Correctional Center Healthcare Unit Administrator, Tarry Williams, Michael Magana, Michael Lemke, Marcus Hardy, Donald Stolworthy, Unknown Illinois Department of Corrections Employees, and Unknown Wexford Health Sources, Inc. Employees, awarding compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Andre Mauldin hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

22

Dated: March 10, 2015

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Mike Kanovitz
Sarah Grady
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900